# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP1176-D |

| | |
|---|---|
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Richard E. Reilly, Attorney at Law:<br><br>Office of Lawyer Regulation,<br>      Complainant-Respondent,<br>   v.<br>Richard E. Reilly,<br>      Respondent-Appellant. |

DISCIPLINARY PROCEEDINGS AGAINST REILLY

| | |
|---|---|
| OPINION FILED: | February 20, 2020 |
| SUBMITTED ON BRIEFS: | December 23, 2019 |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |

ZIEGLER J., dissents, joined by REBECCA GRASSL BRADLEY, J.

NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Peyton B. Engel*, *Richard E. Reilly*, and *Hurley Burish, S.C.*, Madison.

For the complainant-respondent, there was a brief filed by *Kim M. Kluck* and *Office of Lawyer Regulation*, Madison

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP1176-D

STATE OF WISCONSIN        :        IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Richard E. Reilly, Attorney at Law:**

**Office of Lawyer Regulation,**

       **Complainant-Respondent,**

       **v.**

**Richard E. Reilly,**

       **Respondent-Appellant.**

**FILED**

**FEB 20, 2020**

Sheila T. Reiff
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. Attorney Richard E. Reilly has appealed a report and recommendation filed by Referee John B. Murphy, finding that Attorney Reilly committed five counts of professional misconduct and recommending that his license to practice law in Wisconsin be suspended for 60 days. Attorney Reilly has stipulated to the misconduct. He has appealed the referee's recommendation for a 60-day suspension and argues that a public reprimand is an appropriate sanction.

¶2 Upon careful review of this matter, we uphold the referee's findings of fact and conclusions of law. We agree with the referee that a 60-day suspension of Attorney Reilly's Wisconsin law license is an appropriate sanction for his misconduct. We also agree that Attorney Reilly should be required to satisfy any financial obligations that may be imposed by the circuit court in the E.M. case. In addition, we find it appropriate to follow our normal custom of imposing the full costs of this proceeding, which are $15,830.87 as of September 5, 2019, on Attorney Reilly.

¶3 Attorney Reilly was admitted to practice law in Wisconsin in 1966 and practices at Gimbel, Reilly, Guerin & Brown, LLP. In 1985 he received a consensual private reprimand for neglecting two estates and not communicating with an heir. Private reprimand, No. 85-4. In 2004, he received a consensual public reprimand for misconduct that consisted of failing to act with reasonable diligence and promptness by failing to thoroughly prepare a divorce client's case and for failing to timely file his own Wisconsin income tax returns. Public Reprimand of Richard E. Reilly, No. 2004-6 (electronic copy available at https://compendium.wicourts.gov/app/raw/ 002074.html.

¶4 On June 25, 2018, the Office of Lawyer Regulation (OLR) filed a complaint alleging that Attorney Reilly had engaged in five counts of misconduct. The first three counts of misconduct arose out of his representation of E.M. in a divorce action in Ozaukee County Circuit Court. Attorney Reilly began representing E.M. in the divorce in June 2014. E.M. had previously been

2

represented by two other attorneys. E.M.'s husband, M.M., was represented by Attorney Linda Ann Ivanovic in the divorce and post-judgment proceedings.

¶5 On October 22, 2014, E.M. filed her financial disclosure statement. She listed a number of debts that would subsequently be listed in the same amounts in her list of debts in the divorce judgment. Attorney Reilly's law firm assisted E.M. in preparing the financial disclosure statement.

¶6 A trial was held in the divorce proceeding beginning on October 22, 2014 and continuing on two days in November, 2014. Ozaukee County Circuit Court Judge Paul V. Malloy granted the judgment of divorce on November 25, 2014.

¶7 On December 10, 2014, Attorney Reilly deposited a check from M.M. made payable to Gimbel, Reilly, Guerin & Brown, LLP Trust Account in the amount of $97,286.85 into his law firm's trust account. The funds related to a retirement account, and the memo line on the check said, "50% of Ameritrade."

¶8 On January 21, 2015, Judge Malloy held a hearing to clarify the divorce judgment. Judge Malloy said E.M.'s debts "need to be resolved" and that E.M. was "not to discharge them in bankruptcy." Referring to the funds from the retirement account, Judge Malloy said, "As far as I'm concerned, that money was being put into essentially a constructive trust to make sure everybody is paid, that [E.M.] walks out of this without all kinds of debt because they would come back to [M.M.]."

¶9 Judge Malloy entered the findings of fact, conclusions of law and judgment of divorce in the case on February 26, 2015.

3

In the judgment of divorce, Judge Malloy appointed Scribner Cohen & Company as E.M.'s conservator to manage her funds, maintenance, assets, and pay her bills. The judgment of divorce set forth the division of specific debts and financial obligations and said that E.M.'s conservator "shall manage her debts" and "is ordered to pay all of her debts with the funds she received from Respondent's 401(k)."

¶10 The judgment of divorce specified that E.M.'s psychologist fees, CPA fees, and fees owed to the parties' attorneys shall take priority and be considered marital support orders. The divorce judgment ordered that title to a 2014 Range Rover vehicle be immediately transferred to E.M. The divorce judgment ordered that E.M.'s one-half of the Ameritrade account be cashed in and the funds be provided to E.M.'s conservator, who shall manage her assets and pay her bills as specified in the divorce judgment.

¶11 Attorney Reilly did not provide the Ameritrade funds, which had been placed in his law firm's trust account, to the conservator. Attorney Reilly used some of the Ameritrade funds to pay for items not included in E.M.'s debts listed in the divorce judgment, including cleaning services, payments for personal loans, credit card and dentist bills for one of E.M.'s children, cable television and DirecTV bills, car maintenance and repair bills, medical spa treatment bills, and a plane ticket for one of E.M.'s children. Attorney Reilly's use of the Ameritrade funds to pay for items that were not listed in the divorce judgment left other debts that were listed in the judgment unpaid.

4

¶12 In April 2015, Capital One filed a small claims action against E.M. to collect credit card debt that had been listed in the divorce judgment but had not yet been paid. Judgment was entered against E.M. on May 20, 2015 for $4,623.03, plus costs and fees.

¶13 On June 1, 2015, Capital One filed another small claims action against E.M. to collect credit card debt that had been listed in the divorce judgment but had not yet been paid. Judgment was entered against E.M. in that case on October 7, 2015 for $5,089.25, plus costs and fees.

¶14 The judgment in the first small claims case was satisfied in June 2015.

¶15 In either June or the beginning of July 2015, Scribner received a check for $392,322.72 which represented E.M.'s share of the 401(k) retirement account funds. On July 8, 2015, Attorney Reilly directed Scribner to pay $134,375.67 to his law firm for work performed for E.M. in the divorce. This amount represented work performed up to the date of payment.

¶16 On July 15, 2015, E.M. was charged in a criminal complaint with one count of battery or threat to a judge, a felony, and two counts of aggravated battery-intend great bodily harm, also a felony, in Ozaukee County Circuit Court. The charges stemmed from E.M.'s efforts to hire a hit man to batter Judge Malloy, M.M., and M.M.'s then girlfriend.

¶17 On August 3, 2015, Attorney Reilly deposited a check for $71,000 from S & S Auto Broker, Inc. made payable to E.M. into a second trust account at his law firm. The check was for the sale

of the 2014 Range Rover. Attorney Reilly did not deliver the funds from the sale of the Range Rover to Scribner.

¶18 On August 7, 2015, Waukesha County Circuit Court Judge Jennifer R. Dorow was assigned to preside over post-judgment proceedings in the M. divorce.

¶19 On August 10, 2015, Attorney Reilly directed that $25,000 be paid to his law firm as an advanced fee from his law firm's trust account (the account holding the Range Rover sale proceeds) as a retainer for E.M.'s criminal defense.

¶20 On August 17, 2015, Attorney Ivanovic, on behalf of M.M., filed a third post-judgment order to show cause for contempt on E.M., Attorney Reilly, and Scribner, based on the fact that M.M. had not received the attorney fees which E.M. had been ordered to pay in the divorce judgment. On September 16, 2015, Attorney Ivanovic amended the third order to show cause to include a request for an accounting of E.M.'s funds held by Attorney Reilly and Scribner.

¶21 On November 17, 2015, Attorney Reilly provided a joint accounting to Attorney Ivanovic which did not distinguish which funds were being held by him and which funds were being held by Scribner.

¶22 On November 24, 2015, M.M. filed a fourth post-judgment order to show cause for contempt alleging that Attorney Reilly and Scribner violated the orders contained in the judgment of divorce by directing that money be used to pay for debts which were not specifically identified in the divorce judgment.

6

¶23 On December 9, 2015, Attorney Reilly directed that $34,000 be paid from his law firm's trust account holding the Range Rover proceeds to the Ozaukee County Clerk of Courts for E.M.'s bail. The $34,000 included $15,000 that Attorney Reilly's law firm had received from E.M.'s family member and $19,000 that his law firm received from the sale of the Range Rover. After issuing the check for $34,000 toward E.M.'s bail and a check for GPS monitoring, $48.25 remained in the trust account that had been holding the Range Rover proceeds.

¶24 As of December 9, 2015, all $97,286.85 of the Ameritrade funds had been disbursed from the trust account by Attorney Reilly's law firm. As of that date, unpaid debts and obligations exceeding $72,000 that had been ordered paid in the divorce judgment remained unpaid.

¶25 On or about December 22, 2015, Attorney Reilly directed Scribner to pay $6,000 from funds held by Scribner toward E.M.'s bail in the criminal case.

¶26 Judge Dorow heard testimony regarding the fourth order to show cause on January 16 and February 25, 2016. Attorney Reilly, M.M., and Scribner representative Jessica Gatzke testified at the hearing.

¶27 Jessica Gatzke testified she knew the $71,000 received from the sale of the Range Rover and $97,000 from the Ameritrade account, which the court had ordered her to manage, had been placed in Attorney Reilly's trust accounts. Gatzke testified that she did not request that those funds be transferred to Scribner because

7

the money was in an attorney's trust account and she had no reason to believe it was not accounted for.

¶28 Attorney Reilly testified he did not turn over proceeds from the sale of the Range Rover to Scribner because there was a need for funds for E.M.'s criminal defense. Attorney Reilly admitted that the $97,000 in funds from the Ameritrade account were placed in his law firm's trust account and that he did not turn those funds over to the conservator. He further admitted he approved paying some of amounts in excess of the amounts specified in the divorce judgment, and he admitted he directed the conservator and his law firm to pay money for E.M.'s bail even though there was nothing in the divorce judgment authorizing funds to be used for that purpose.

¶29 On July 6, 2016, Attorney Reilly's law firm, on behalf of Attorney Reilly and E.M., and Attorney Ivanovic presented argument to Judge Dorow regarding the fourth order to show cause. In Judge Dorow's oral decision, she found Attorney Reilly in contempt of court for multiple intentional and willful violations of the divorce judgment, including failing to turn over the Ameritrade funds or the proceeds from the sale of the Range Rover to the conservator; directing excess payments to his law firm and other creditors; paying a $25,000 retainer to his law firm in E.M.'s criminal matter; paying $19,000 from his law firm's trust account toward E.M.'s bail; and directing the conservator to pay $6,000 toward E.M.'s bail.

¶30 Judge Dorow ordered that the Ameritrade funds, the proceeds from the Range Rover sale, the retainer in the criminal

8

case, the bail money, and the excess payments of professional fees be returned within 30 days. She also found that so long as the debts listed in the divorce judgment remained unpaid, the contempt of court was ongoing. Judge Dorow commented, "[It] really appears to this Court that the funds of [E.M.] were nothing short of a repository of funds for Gimbel, Reilly, Guerin and Brown and their attorneys' fees." Judge Dorow entered a written decision of her findings on July 18, 2016. Attorney Reilly and Scribner were ordered to pay specific amounts to a successor conservator.

¶31 In August 2016, Attorney Reilly filed a notice of appeal from the order holding him in contempt of the judgment of divorce. The court of appeals affirmed in part and reversed in part. With respect to the award of attorney fees, the court of appeals held that the circuit court did not err in determining that Attorney Reilly and Scribner engaged in contemptuous conduct in paying Attorney Reilly fees related to the divorce action that were in excess of the fees due through February 26, 2015. The court of appeals remanded the issue to the circuit court to determine what amount of fees was reasonably incurred through February 26, 2015.

¶32 The court of appeals also held that the circuit court did not err in determining that Attorney Reilly and Scribner engaged in contemptuous conduct in paying professional fees in excess of the fees due. The court of appeals observed that by paying excess professional fees, Attorney Reilly and Scribner compromised Scribner's ability to fairly pay other debts as ordered in the divorce judgment.

9

¶33 With respect to Scribner using $6,000 from E.M.'s funds toward payment of E.M.'s bail, the court of appeals noted that Scribner's clear and specific directive in the divorce judgment was to pay E.M.'s debts and bills listed in the divorce judgment. The court of appeals held that using funds for bail unquestionably did not qualify as payment of a debt, much less one of the itemized debts that Scribner was authorized and directed to pay. In addition, the court of appeals held the circuit court did not err in finding Attorney Reilly in contempt for directing that $19,000 be paid from his trust account toward E.M.'s bail.

¶34 The court of appeals also affirmed the circuit court's finding of contempt in relation to Attorney Reilly's payment of the $25,000 to his law firm because he did not specifically challenge that finding of contempt. The court of appeals said Attorney Reilly's involvement with selling the Range Rover and keeping $25,000 of the funds as payment to his law firm for E.M.'s criminal representation was directly in conflict with the divorce judgment. Scribner filed a petition for review with this court. This court denied the petition for review in October 2017.

¶35 The OLR's complaint alleged the following counts of misconduct with respect to Attorney Reilly's handling of E.M.'s divorce:

**Court One:** By failing to deliver the funds from the sale of the 2014 Range Rover vehicle and the funds from the Ameritrade account to Scribner, Attorney Reilly

10

violated former SCR 20:1.15(d)(1) and current SCR 20:1.15(e)(1).[1]

**Count Two:** By failing to comply with the February 26, 2015 judgment of divorce, Attorney Reilly violated SCR 20:3.4(c).[2]

**Count Three:** By continuing to represent E.M. in the post-judgment proceedings while there was a significant risk that his representation was materially limited by his own personal interest with respect to the order to show cause for contempt, Attorney Reilly violated SCR 20:1.7(a)(2).[3]

---

[1] Effective July 1, 2016, substantial changes were made to Supreme Court Rule 20:1.15, the "trust account rule." See S. Ct. Order 14-07, 2016 WI 21 (issued Apr. 4, 2016, eff. July 1, 2016). Because the conduct underlying this case arose prior to July 1, 2016, unless otherwise indicated, all references to the supreme court rules will be to those in effect prior to July 1, 2016.

Former SCR 20:1.15(d)(1) was renumbered as SCR 20:1.15(e)(1). The text of the rule was not changed and provides:

Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

[2] SCR 20:3.4(c) provides: "A lawyer shall not knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists."

[3] SCR 20:1.7(a)(2) provides:

(a) Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

¶36 The second client matter detailed in the OLR's complaint involved Attorney Reilly's representation of J.D'A. in a divorce action. The divorce was filed in 2010. J.D'A. and her husband filed a stipulated marital settlement agreement in 2011, and a divorce judgment was entered. The divorce judgment required the husband to pay child support arrears, child support, maintenance, attorney fees, and other expenses.

¶37 In January 2012, J.D'A.'s prior attorney filed a motion for contempt based on J.D'A.'s ex-husband's failure to comply with the court order support and maintenance payments. The ex-husband ultimately stipulated to a finding of contempt. A family court commissioner withheld entering a finding of contempt, and the parties stipulated to dates by which the ex-husband was to meet his payment obligations to purge the contempt. The family court commissioner found the ex-husband in contempt in March 2013 and ordered him to serve 90 days in jail, but the court stayed the sentence for 24 months if the ex-husband made payments for child support arrears, child support, and maintenance payments.

¶38 J.D'A. hired Attorney Reilly to represent her in the family matter in May 2013. She signed a written legal representation agreement which provided that Attorney Reilly's legal services would be billed at $300 per hour. She paid Attorney

. . .

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

12

Reilly an advanced fee of $2,500. The circuit court entered an order substituting Attorney Reilly as counsel of record on June 4, 2013.

¶39 On June 14, 2013, counsel for J.D'A.'s ex-husband sent a letter to the family court commissioner, copying Attorney Reilly, saying that the ex-husband had a bankruptcy proceeding pending so all enforcement/contempt proceedings should be stayed by operation of the automatic stay in 11 U.S.C. § 362. The bankruptcy matter was subsequently dismissed because the ex-husband failed to file required documents.

¶40 J.D'A.'s ex-husband filed a second bankruptcy petition in September 2013. On that date the bankruptcy court clerk issued a notice of bankruptcy case filing which stated, "In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property." Also on that date, the ex-husband's attorney sent a letter to Attorney Reilly advising him to the bankruptcy filing.

¶41 On September 30, 2013, counsel for J.D'A.'s ex-husband faxed a letter to the family court commissioner and counsel, including Attorney Reilly, saying that it is a violation of the automatic stay provision in 11 U.S.C. § 362 to proceed with the contempt action after a bankruptcy case has been filed.

¶42 On September 30, 2013, the family court commissioner held a hearing regarding the earlier contempt order. The commissioner ordered that the family matter would be stayed as a result of the bankruptcy filing.

13

¶43 The next hearing regarding the contempt matter was scheduled for January 13, 2014. On that date, Attorney Reilly sent a letter to the family court commissioner regarding the bankruptcy case and said he was prepared to proceed with the contempt hearing. Counsel for J.D'A.'s ex-husband filed a letter with the family court commissioner saying that the bankruptcy trustee had not yet determined what was and was not property of the bankruptcy estate.

¶44 The family court commissioner held a hearing on the contempt motion on January 13, 2014. An attorney from Attorney Reilly's law firm appeared on behalf of J.D'A. and argued that the contempt was ongoing and that there did not need to be a new finding of contempt for the period of time after the bankruptcy was filed. The family court commissioner made an oral ruling stating she believed the court had the authority to lift the stay and impose the contempt sanction and gave J.D'A.'s ex-husband until January 31, 2014 to purge the contempt by paying $15,000.

¶45 On January 21, 2014, J.D'A.'s ex-husband commenced an adversary case in bankruptcy court by filing a debtor's complaint for willful violation of the automatic stay with respect to the action to enforce the support order in the family matter during the time the automatic stay was in effect. Attorney Reilly was represented in the adversary case by an attorney from his law firm. The bankruptcy judge held a hearing in the adversary case on January 30, 2014 and ruled that the family court commissioner's January 13, 2014 oral ruling was void and that the defendants in the adversary case were enjoined from taking any action to enforce

14

the family court commissioner's oral ruling or to reduce the oral ruling to writing.

¶46 On March 4, 2014, Attorney Reilly's law firm opened a new client billing matter entitled "Client: 201407603M [D'A.] – Reilly." A subsequent report on that billing matter reflected that the billing included work by Attorney Reilly's law firm dating back to January 10, 2014.

¶47 Attorney Reilly and J.D'A. did not have a separate written legal representation agreement for Attorney Reilly or his law firm to represent her in the adversary case.

¶48 The bankruptcy judge granted a motion for summary judgment and dismissed the adversary complaint as to Attorney Reilly with prejudice in July 2014. On July 29, 2014, J.D'A. and her ex-husband entered into a stipulation in the adversary case stating that J.D'A. may be dismissed from the action with prejudice and without costs or fees. The bankruptcy court approved the stipulation and dismissed J.D'A. with prejudice. The bankruptcy court also dismissed the complaint and closed the adversary case.

¶49 On February 16, 2016, Attorney Lani L. Williams sent Attorney Reilly an email advising that J.D'A. had requested that Attorney Williams take over representation of J.D'A. in the family matter.

¶50 Attorney Williams met with Attorney Reilly at Attorney Reilly's office on February 26, 2016 to discuss the case and review the file. At the meeting, Attorney Reilly gave Attorney Williams a billing summary, dated February 8, 2016, for work that Attorney Reilly and his law firm had performed defending J.D'A. in the

15

family matter and a Detail Work-in-Progress report dated February 8, 2016 for work that Attorney Reilly and his law firm billed for defending Attorney Reilly personally in the adversary case in bankruptcy court.

¶51 During the February 26, 2016 meeting, Attorney Williams requested that Attorney Reilly give her J.D'A.'s entire client file in the family matter. Attorney Reilly told Attorney Williams he would only turn over the original file so she could make a copy of it and that Attorney Williams had to return the original client file to Attorney Reilly's office. Attorney Reilly refused to have his office staff copy the file, saying it would cost hundreds of dollars and hours of staff time to complete. Attorney Williams agreed to copy the file and return it to Attorney Reilly in one week.

¶52 Attorney Williams reviewed the client file and noted that it contained no notes and almost no written or electronic communications or memos between Attorney Reilly and the staff at his law firm. Other documents were also missing from the file, including over 80 pages of notes and memos relating to the bankruptcy and post-divorce proceedings and a transcript of a hearing in the family matter.

¶53 On March 2, 2016, Attorney Reilly's office sent, via electronic mail, a "Request, Consent and Order for Substitution of Attorneys and Judgment for Attorney Fees," with the caption of the family matter. The proposed consent and order contained a separate consent to judgment for attorney fees in favor of Attorney Reilly and against J.D'A. in the amount of $31,127.26. J.D'A. did not

16

sign the proposed consent and order containing the judgment for attorney fees.

¶54 Attorney Williams returned J.D'A.'s original file in the family matter to Attorney Reilly's office on March 4, 2016.

¶55 In a letter to Attorney Reilly dated April 14, 2016, Attorney Williams advised Attorney Reilly that J.D'A. would not be paying the $23,690.45 in fees and expenses that Attorney Reilly and his law firm billed for work in defending Attorney Reilly personally in the adversary case.

¶56 On May 25, 2016, J.D'A. filed a request for substitution of attorneys in the family matter, substituting Attorney Williams in place of Attorney Reilly. The circuit court signed the order of substitution that same day.

¶57 On November 15, 2017, Attorney Reilly sent a letter to J.D'A. stating that his law firm "wrote off and absorbed" the $23,690.45 in fees and expenses related to J.D'A.'s ex-husband's "ancillary tactical bankruptcy action."

¶58 The OLR's complaint alleged the following counts of misconduct with respect to Attorney Reilly's representation of J.D'A.:

> **Count Four:** By billing his client for his own personal defense as an individually named defendant in an adversary case in the United States Bankruptcy Court for the Eastern District of Wisconsin, Attorney Reilly violated SCR 20:1.5(a).[4]

---

4 SCR 20:1.5(a) provides:

   (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be

17

**Count Five:** By failing to deliver the original case file to his client's successor counsel, and then by only allowing successor counsel to borrow the original case file on the condition that she copy the file at her own expense, Attorney Reilly violated SCR 20:1.16(d).[5]

¶59 Attorney Reilly filed an answer to the complaint on August 3, 2018. On January 3, 2019, the parties filed a

considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

[5] SCR 20:1.16(d) provides:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

18

stipulation whereby Attorney Reilly withdrew his answer to the complaint and admitted all of the facts and allegations contained in the complaint. The stipulation did not contain an agreement as to the proposed discipline. The stipulation detailed the various amounts that Attorney Reilly paid to the conservator and other parties in the E.M. case. Attorney Reilly agreed to satisfy any remedial sanctions that might be assessed by the circuit court in the E.M. case.

¶60 The hearing on the appropriate sanction to impose for Attorney Reilly's admitted misconduct was held on January 4, 2019. The referee issued his report and recommendation on April 29, 2019. The referee found, by virtue of the stipulation, the OLR had proved by clear, satisfactory, and convincing evidence that Attorney Reilly committed the five counts of misconduct alleged in the OLR's complaint.

¶61 With respect to Attorney Reilly's representation of E.M., the referee said that Attorney Reilly justified his actions by suggesting he was acting only on his client's behalf in making the disbursements. The referee disagreed, saying since the disbursements were used to make payments on debts not included in the divorce judgment, Attorney Reilly was enabling his client to violate the circuit court's order. The referee also said Attorney Reilly used some of the funds to pay his own fees and in the case of the proceeds from the car sale, he provided his law firm with a $25,000 retainer to represent E.M. in her criminal matter. The referee said, "Absolute compliance with a court's decisions and orders is at the foundation of our legal system. Neither litigants

19

nor attorneys can pick and choose which court orders they decide to follow and which they do not."

¶62 With respect to Attorney Reilly's representation of J.D'A., the referee said since Attorney Reilly was aware of J.D'A.'s financial situation, it was highly inappropriate for him to present her with a bill which he knew she could not pay when she retained new counsel. The referee said the only explanation for presenting the bill was that Attorney Reilly wanted to harass J.D'A. for purposes of retaliation because he was angry that she obtained a new attorney. The referee also said:

> Additionally, Reilly must have known that it would be inappropriate for [J.D'A.] to pay for Reilly's own defense in the adversary case. It was Reilly's own disregard for the power of the Automatic Stay that got Reilly in trouble with the Bankruptcy Court. Therefore, Reilly was responsible for his own representation.

¶63 The referee said there was no question that all of the acts of misconduct in both cases were intentional. The referee said Attorney Reilly knew he should comply with the court order in the E.M. case and deliver the funds he had received to the conservator, but he intentionally chose not to do so. The referee said Attorney Reilly also knew the provisions of the divorce judgment and he chose to disregard them. The referee further said that Attorney Reilly knew he could not represent both himself and E.M. at the same time in the same case, yet he did not withdraw from representing E.M. as was required. With respect to Attorney Reilly's representation of J.D'A., the referee said that Attorney Reilly knew he had no right to retain his client's file when she hired a new attorney, and he also knew he could not charge his

20

client for the time he spent defending himself in the adversary case in bankruptcy court.

¶64 The referee said Attorney Reilly appeared to minimize the extent of injury caused by his actions in both cases and his theory seems to be he provided good legal representation to both clients. The referee said Attorney Reilly also says he returned the money to E.M.'s marital estate after the contempt finding, and he did not try to collect the money that he claimed J.D'A. owed him so little or no harm was done to either client. The referee said:

> Reilly is mistaken. First of all, by depleting the [E.M.'s] marital estate on unauthorized expenditures (including payments to himself) he prevented the proper payment of the martial debts thereby exposing [M.M.] to a variety of credit problems. Additionally, there is no way to know what effect Reilly's cavalier attitude toward the family court's orders had upon [E.M.'s] bizarre behavior and her own disregard for the authority of the court. In any case, Reilly was far from a shining example for his client.
>
> By giving [J.D'A.] the excessive bill in retaliation for getting a new attorney and by asking her to sign a consent for entry of judgment for the bill, Reilly obviously caused [J.D'A.] to have considerable concern over how she was going to either pay the bill or fight its payment in court. Even though Reilly asserted later that he was not serious about the bill, neither [J.D'A.] nor her attorney knew this to be the case at the time.
>
> Also, by failing to promptly turn over her divorce file, Reilly impeded William's ability to best represent her client in her efforts to collect needed child support. Though Williams finally did get the file, after being harassed by Reilly, the file was incomplete. This meant extra work for Williams and, perhaps, a delay in getting the support payments.

21

¶65 The referee noted that Attorney Reilly has two prior reprimands, a private reprimand in 1985 and a public reprimand in 2004. The referee said Attorney Reilly improperly used some of E.M.'s funds to pay his law firm's fees in excess of the amount due and to pay a retainer to his own law firm in E.M.'s criminal case. The referee said Attorney Reilly's violation of the M. divorce judgment was ongoing and ended only when the circuit court intervened and found Attorney Reilly in contempt. The referee said although Attorney Reilly admitted to all of the allegations contained in the OLR's complaint, it was clear he still felt some of his behavior in the E.M. case was justified. The referee said while it is not clear that E.M. was a "victim" in the traditional sense, there is no question E.M. was very vulnerable given her mental condition, and it is presumed E.M. relied on Attorney Reilly to make good legal decisions on her behalf. The referee said J.D'A. was certainly economically vulnerable when Attorney Reilly sought to collect his bill in an inappropriate manner and for an inappropriate amount. The referee noted that Attorney Reilly had actively practiced law for 53 years and was a founding member of his law firm, so he had substantial practice in the law.

¶66 As mitigating factors, the referee said Attorney Reilly was cooperative throughout the OLR proceeding. The referee noted Attorney Franklyn Gimbel testified on behalf of Attorney Reilly at the sanctions hearing and according to Attorney Gimbel, who has known Attorney Reilly for 50 years, Attorney Reilly is an outstanding lawyer with a reputation for taking hard cases and he has served on the Committee for the Revision of the Code of

22

Professional Responsibility of the Wisconsin Bar Association. The referee also noted that after Attorney Reilly was found to be in contempt of court, his law firm did repay over $61,000 to E.M.'s marital estate. The referee said that Attorney Reilly is obviously sorry he finds himself in the situation he is now in and says he regrets his behavior in both matters.

¶67 The referee ultimately recommended a 60-day license suspension. He said it is very important that Attorney Reilly realize that disregarding the circuit court's authority, as he did in the E.M. case, cannot be tolerated if our legal system is to properly function. The referee also said that Attorney Reilly must realize he cannot let his temper get the best of him in his dealings with his clients and his fellow attorneys.

¶68 The referee said even if Attorney Reilly perceived himself poorly used by J.D'A.'s act of hiring a new attorney, he had no right to harass his client and her new attorney, to withhold parts of the file, or to threaten his client using questionable debt collection practices. In addition, the referee said the sanction imposed on Attorney Reilly must deter other attorneys from acting improperly in the practice of law. The referee said, "Consistent with the concept of progressive discipline and consistent with the seriousness of the offenses outlined in the Complaint, a loss of practice privileges is required." The referee said a 60-day suspension was reasonable and would meet the goals of educating both the offending lawyer and other lawyers of the need to fully comply with the Rules of Professional Conduct for attorneys. The referee further recommended that Attorney Reilly

23

pay the full costs of the proceeding and that he be ordered to fully comply with the circuit court's order in the E.M. case.

¶69 In his appeal, Attorney Reilly argues that a suspension is an excessive sanction for his admitted misconduct and that a public reprimand is an appropriate and sufficient level of discipline. Attorney Reilly accuses the referee of unfairly extending the factual record to fit his view that Attorney Reilly is "a bad actor." Attorney Reilly says he never set out to commit misconduct. He says with respect to the E.M. case, E.M. was an unusually troublesome client. He notes Judge Malloy opined that E.M. has serious mental health issues. Attorney Reilly said that E.M. went on a $74,000 shopping spree, forged checks, was jailed multiple times for contempt, and finally tried to arrange for someone to harm both her ex-husband and Judge Malloy.

¶70 Attorney Reilly says while the divorce judgment attempted to bring some order to E.M.'s financial life by prioritizing certain debts, allocating money to address them, and appointing Scribner Cohen to manage her money, the judgment of divorce could not have anticipated E.M.'s criminal conduct. Attorney Reilly said, "Suddenly, [E.M.] was in need of criminal defense, and Attorney Reilly had to think creatively about how to fund it. Attorney Reilly believed at the time that selling the Land Rover was an acceptable course of action, though ultimately this proved not to be the case." Attorney Reilly said the situation was chaotic, and although he does not contest the fact that his actions were inconsistent with the express terms of the judgment of divorce, he says the disbursements he made were

24

legitimate expenses and his actions "were the product of having to respond to urgent, bizarre, and unforeseeable circumstances, and the actions he took were for [E.M.'s] benefit. They were misconduct, but without malicious intent."

¶71 With respect to J.D'A., Attorney Reilly said he knew very well she was in dire financial straits. He again agrees he did not handle the matter properly, and he says he did not expect the invoice he presented to Attorney Williams to be paid. He says, his "effort to collect an unreasonable fee was half-hearted, at most, and caused no harm to the client." Attorney Reilly also admits he did not turn over J.D'A.'s file as he should have when Attorney Williams requested it, and he agrees he should have borne the cost of copying the file.

¶72 Attorney Reilly argues that although he has previously received two reprimands, those events are far in the past and concern conduct unrelated to the present matter. He disagrees with the referee that he acted with a dishonest or selfish motive, and he disputes the fact that his actions amounted to a continuing pattern of misconduct.

¶73 Attorney Reilly agrees that E.M. is vulnerable, but he says he worked on her behalf and for her benefit and says she is not his victim. He says that to the extent there is a victim in this case, it is J.D'A. "who was the recipient of a piece of passive-aggressive correspondence from Attorney Reilly. She was certainly financially vulnerable, but she was victimized only to the extent that she received a request to consent to fees. She did not consent, and therefore suffered no financial harm."

25

¶74 Attorney Reilly says there are numerous mitigating factors in this case, including his timely good faith effort to rectify the consequences of his misconduct; his cooperation throughout the proceeding; his character, reputation, and history of service to the State Bar; the fact he has already been sanctioned in the E.M. matter in the form of a contempt order; the fact that he is remorseful for his misconduct; and the fact that 15 years have passed since he received his last reprimand.

¶75 Based on all these factors, Attorney Reilly argues that a public reprimand would be an appropriate level of discipline. In support of this argument, he points to In re Disciplinary Proceedings Against Tjader, 2018 WI 96, 384 Wis. 2d 51, 918 N.W.2d 418, in which an attorney with substantial experience in the practice of law and two prior reprimands received a public reprimand after stipulating to six counts of misconduct involving three clients.

¶76 The OLR argues that the 60-day suspension recommended by the referee is an appropriate level of discipline. The OLR acknowledges that the referee's report contains some minor mistakes of fact in a very fact intensive case. For instance, the OLR notes the referee stated that the Ameritrade funds were applied to pay items not listed in the divorce judgment and did not pay any of the items that were listed, when in fact, some of the Ameritrade funds were used to pay some of the debts listed in the divorce judgment. The OLR says the important point the referee was making was that many of the expenses not in the divorce

judgment were paid by Attorney Reilly, leaving a number of debts specified in the judgment of divorce unpaid.

¶77 The OLR says the referee properly considered the nature of Attorney Reilly's misconduct and considered both aggravating and mitigating factors. The OLR says Attorney Reilly disobeyed a court order on multiple occasions, ignored a conflict of interest, tried to collect an unreasonable fee, and failed to turn over a client's file. The OLR says that Attorney Reilly's conduct is analogous to that In re Disciplinary Proceedings Against Marchan, 2018 WI 30, 380 Wis. 2d 598, 910 N.W.2d 531 in which an attorney received a six-month suspension for, among other things, attempting to collect an unreasonable fee after not having previously billed the client and, upon termination of representation, refusing to give the client the file unless the client agreed to make a copy for Attorney Marchan at the client's expense.

¶78 The OLR says whatever sanction this court imposes should impress upon Attorney Reilly the seriousness of his misconduct and should deter other attorneys from committing similar misconduct. The OLR says the record supports the referee's recommendation of a 60-day suspension and a requirement that Attorney Reilly be ordered to fully comply with the trial court's order in the E.M. case regarding the amount to be repaid by Attorney Reilly to E.M.'s estate.

¶79 In his reply brief, Attorney Reilly appeals to this court's sense of proportionality. He again notes that he stipulated to all of the counts in the complaint. He says to the

27

extent money was to be repaid, it has been. He says the lasting effects of his misconduct, to the extent they exist, truly are minimal. He says he acknowledges his actions were wrongful. He says his prior discipline is remote in time. He says the referee's and the OLR's allegations of selfish motive are at best attenuated. He says under the particular circumstances presented here, a 60-day suspension is excessive and a public reprimand would be an appropriate level of discipline.

¶80 A referee's findings of fact are affirmed unless clearly erroneous. Conclusions of law are reviewed de novo. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit, regardless of the referee's recommendation. See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶81 There has been no challenge to any of the referee's findings of fact, and accordingly we adopt them. We further agree with the referee's conclusions of law that Attorney Reilly violated the Supreme Court Rules set forth above.

¶82 Turning to the appropriate level of discipline, we conclude that the 60-day suspension recommended by the referee is an appropriate sanction for Attorney Reilly's misconduct.

¶83 Although no two disciplinary proceedings are identical, we find this case to be somewhat analogous to In re Disciplinary Proceedings Against Hudec, 2019 WI 39, 386 Wis. 2d 371, 925 N.W.2d 540. In that case, an attorney with 40 years of experience who had a series of private and public reprimands received a 60-

28

day suspension after stipulating to six counts of misconduct arising out of two client matters. The misconduct included failing to act with reasonable diligence and promptness in representing a client; failing to keep a client reasonably informed about the status of the matter; and failing to make a reasonably diligent effort to comply with discovery requests.

¶84 This court has long adhered to the concept of progressive discipline in attorney regulatory cases. See In re Disciplinary Proceedings Against Netzer, 2014 WI 7, ¶49, 352 Wis. 2d 310, 841 N.W.2d 820. Even though Attorney Reilly has not been disciplined since 2004, this is his third disciplinary proceeding. The misconduct at issue here is serious and involved Attorney Reilly intentionally disregarding a circuit court divorce judgment and disregarding the automatic stay in a bankruptcy case. Imposing another reprimand would unduly depreciate the seriousness of the misconduct at issue.

¶85 We also agree with the referee that Attorney Reilly should be required to fully comply with any future circuit court orders in the E.M. case and should be required to satisfy any additional financial obligations that may be ordered. As is our usual custom, we find it appropriate to assess the full costs of the proceeding against Attorney Reilly.

¶86 IT IS ORDERED that the license of Richard E. Reilly to practice law in Wisconsin is suspended for a period of 60 days, effective April 2, 2020.

¶87 IT IS FURTHER ORDERED that Richard E. Reilly shall be required to satisfy any additional financial obligations that may be ordered by the circuit court in the E.M. case.

¶88 IT IS FURTHER ORDERED that Richard E. Reilly shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶89 IT IS FURTHER ORDERED that within 60 days of the date of this order, Richard E. Reilly shall pay to the Office of Lawyer Regulation the costs of this proceeding, which are $15,830.87 as of September 5, 2019.

¶90 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.28(2).

¶91 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* While I agree that Attorney Reilly's conduct warrants more than a public reprimand, I would impose a 30-day suspension. In <u>In re Disciplinary Proceedings Against Schnitzler</u>, 140 Wis. 2d 574, 412 N.W.2d 124 (1987), this court adopted the policy of imposing a minimum 60-day period of suspension, in large part because it concluded a 30-day suspension period was not sufficient time for an attorney to notify clients, courts, administrative agencies, and attorneys for opposing parties of the suspension. The advent of electronic communications has largely obviated this concern. Adhering to the policy of 60-day minimum suspension deprives the court of the ability to impose an appropriate level of discipline commensurate with the particular facts of each case.

¶92 Accordingly, I respectfully dissent.

¶93 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.